198 So. 606

TEXTILE WORKERS UNION OF ANNISTON, Ala., AND VICINITY, LOCAL 204, et al. v. FEDERAL LABOR UNION NO. 21500 OF ANNISTON, Ala., et al.

7 Div. 631.

Supreme Court of Alabama.

Oct. 10, 1940.

Rehearing Denied Nov. 22, 1940.

240

Ling & Bains, of Bessemer, for appellants.

Chas. F. Douglass, of Anniston, and John L. Busby, of Birmingham, for appellees.

BOULDIN, Justice.

This cause involves the ownership of certain funds as between two local labor unions, unincorporated associations of union workers.

The suit was brought in the name of the appellee union, individual members of this union joining as plaintiffs, against appellant union, and certain officers and members thereof, as defendants.

In Alabama such suit may, by statute, be brought by and in the name of one

unincorporated association against another. Code 1923, § 5723 et seq.

The claims of the parties arise from a chain of facts in course of union labor activities. We summarize the controlling facts.

The United Textile Workers of America, known in Labor circles as U. T. W. A., was organized in 1901, and, until 1936, was affiliated with A. F. L. In 1933 a local union of textile workers in Anniston, Alabama, was organized and chartered to constitute a branch of United Textile Workers of America to be known as Mill Workers Branch of U. T. W. A. This local union was designated "Local Union No. 997 B of Anniston, Alabama." Its members were employees of Utica Knitting Company, working in the Anniston Mill, and the local is frequently designated by witnesses as "Utica Local 997 B."

The funds in question, approximately $1,500, were accumulated in the treasury of this local from dues paid in by members to be used for the benefit of the local union and its members, the per capita tax due the parent union having been paid. Charter rights of the parent union in this fund will be noted later. On August 5, 1936, United Textile Workers of America was suspended from its affiliation with American Federation of Labor.

The resolution of suspension was upon charges that U. T. W. A., along with other unions, "had violated the Constitution and Laws of the American Federation of Labor by setting up a dual union called the Committee for Industrial Organization and by inaugurating a state of rebellion against the American Federation of Labor and hence had breached their contractual obligation in the charter or certificate of affiliation of each of said unions." The order of suspension reads: "Any union now affiliated with the Committee for Industrial Organization, not announcing its withdrawal therefrom on or before September 5th, 1936, shall thereupon by this order automatically stand suspended from the American Federation of Labor and from enjoying all and any privileges and benefits of membership and affiliation with the American Federation of Labor."

The U. T. W. A. did not withdraw from affiliation with C. I. O.

To the contrary, on March 7th, 1937, an agreement was entered into between C. I. O., and U. T. W. A., looking to setting up a Textile Workers Organizing Committee (T. W. O. C.) of the C. I. O. The stipulations of Section 2 and 3 of this agreement appear in the report of the case. The T. W. O. C. took over pursuant to this agreement.

This led to a campaign among the membership of Union Local 997 B in Anniston looking to alignment with C. I. O. This agitation, it appears, began in June, 1937, upon receiving notice that local unions in other Utica Knitting Mills of the·East and North had taken such step.

On October 1, 1937, at a very full meeting of the local union 997 B, it was resolved to go into C. I. O. The vote was unanimous. Probably 80 to 90 per cent of the membership was present. That a majority so voted is not disputed. A quorum called for a very limited number.

A week later, by a similar vote, it was resolved to accept a charter from the T. W. O. C., which was granted under designation of "Textile Workers Union of Anniston, Alabama, and vicinity, Local 204." Thereafter the local functioned under this name and set-up. The funds in question were passed to this local. The charter of 997 B was returned, and that local ceased to function as such. T. W. O. C. participated in negotiating the collective bargaining contract between ·Local 204 and their employer, Utica Mills. This contract gave certain preferential rights to members of the union in case the number of employees were reduced from time to time.

On the 15th day of February, 1938, a charter or certificate of affiliation was granted by American Federation of Labor to seven persons therein named and to their successors, legally qualified, to constitute a local union under the title of "Federal Labor Union No. 21500, Anniston, Alabama." Such a Federal Union is affiliated directly with A. F. L.

This suit was filed July 26, 1938, in the name of this latter union, and certain individuals at that time members thereof. None of the charter members join in the suit.

The claim to the fund in question is bottomed on the contention that this Federal Union is the rightful successor to Local 997 B in relation to this fund.

■■ "The withdrawal of a local union from one general association and its affiliation with another has no effect on the funds or property belonging to such local; hence, on the secession from a national association of a local labor union

which joined with another national association, a minority of such local union retaining its membership in the former national association is not entitled to the funds of the local union. However, where the laws of a general association prohibit the withdrawal of a local from membership on objection of a stated number, a mere majority vote of the members of the local cannot authorize the transfer of the funds of the local to another organization, the local with its remaining minority being entitled to such funds as against another local with which the majority of the old local had affiliated." 63 C.J. 698.

This general statement of the law has been applied where contract rights of the parent union are embodied in the charter of the local and in violation of such contractual obligation the majority of the local union undertakes to secede and affiliate with another and opposing organization, while the minority designated by contract remain loyal to the parent association and carry on under the original charter. Harris et al. v. Backman, et al., 160 Or. 520, 86 P.2d 456; Low et al. v. Harris et al., 7 Cir., 90 F.2d 783; O'Neill v. Delaney, Sup.Ct., 158 N.Y.S. 665; Lumber and Sawmill Workers Union No. 2623 et al. v. International Woodworkers of America, etc., 197 Wash. 491, 85 P.2d 1099; Local No. 2508 Lumber & Sawmill Workers, et al. v. Cairns, et al., 197 Wash. 476, 85 P.2d 1109; 63 C.J. 662, § 11.

Certain counts of the complaint are based on Sections 5 and 7 of the Constitution of the parent association, United Textile Workers of America. These sections appear in the report of the case.

■ These contractual obligations were between the parent association, U. T. W. A., and its Local 997 B. Was the action of the majority of this local in affiliating with C. I. O., in violation of this obligation to its parent union? Clearly not. Without dispute the movement for such affiliation originated with the parent union. The local union merely followed the lead of the parent union. Hence, the action of the Local, a unanimous vote of a majority in meeting in favor of the new affiliation was not antagonistic; but in pursuance of the lead of the parent association. This body of local union workers, the majority contributing the common fund for local union purposes, is surely the successor of Local 997 B, in so far as the local union and the parent union could make it such

successor. The acceptance of a new T. W. O. C. charter is not shown to be out of keeping with the set-up fathered by the parent association. That association, so far as appears, has never disowned the action of the local in accepting a new charter and turning in the old. As for the A. F. L., the suspension of the parent union was also a suspension of the local union, as an affiliate through the parent union. The effect of the order of suspension by its terms was to end all affiliation with A. F. L. as an active functioning union. It appears in evidence that further affiliation with the State Federation of Labor as well as the local council in Anniston was denied to local union 997 B after such suspension. As a going local union it was effectually out of A. F. L., after the order of suspension. The parent union was finally expelled in May, 1938, prior to the bringing of this suit.

The charter issued to Federal Union No. 21500 does not purport to recognize any relation between that union or its charter members and Utica Local 997 B. It was a new union under a new and different affiliation.

■ Other counts of the complaint allege fraudulent misrepresentations on the part of leaders in the movement to affiliate with C. I. O., inducing members to approve the move.

Some evidence was offered tending to show representations by influential leaders to the effect that they had been kicked out of A. F. L., that there was nowhere to go save to the C. I. O., that their jobs at the mill were at stake, etc. There is much conflict in the evidence here. How far such exaggerated or partisan expressions misrepresented the real situation is a question. Assuming, however, that the vote of some members were thus influenced, a finding that the majority vote was thus obtained would be purely speculative under the evidence. This vote involved a question of affiliation, a matter of internal policy to be determined within the order by its own methods. The fund in question became involved merely as an incident. Courts are specially reluctant to enter into inquiries into the internal affairs of such associations in suits of this sort. For instance, could the minority succeed to the funds of the whole because the majority who had contributed to the fund, and entitled to its use, had been misled into a new affiliation? Such majority

surely were entitled to determine whether they were so misled, and to affirm or disaffirm their action. The rule requiring that remedial action be sought within the union seems clearly applicable to the situation. 4 Am.Jur. 467, § 19; 7 C.J.S., Associations, pages 79–82, § 34.

While some evidence is to the effect that at a later period some effort was made to have a vote on re-adherence to the A. F. L., it does not appear that charges questioning the validity of former votings because of misrepresentations were ever presented. The ruling of a presiding officer on whether a proposed vote, or other action, looking to a change of the status quo, was in order, was subject to review by the body. No such steps were taken. To raise the question in this suit is analogous to the contest of an election in a collateral proceeding. Apart from all this, it nowhere appears that the charter of Federal Union No. 21500 was ever applied for or granted by A. F. L., as a successor to Utica Union 997 B. Whether A. F. L. would have granted a charter to any group seeking same as successor to 997 B, having no affiliation save through its parent union, and which affiliation had been effectively severed by suspension does not appear.

No one of the charter members of Federal Union No. 21500 appeared as a witness to testify that he or she had been misled into the group of C. I. O., or claimed any rights through succession to suspended union 997 B.

It was the clear right of union workers, preferring the policies of A. F. L., to organize a new Federal Union and become an affiliate of A. F. L., by direct proceeding under its laws.

But under no phase of the evidence, in our opinion, are the plaintiffs entitled to recover the funds passing to defendants through the action of those entitled thereto by unanimous majority vote. This case in no way involves the property rights of A. F. L. in the funds of the parent union U. T. W. A. Hence, the validity of the contract between U. T. W. A. and C. I. O. as touching such funds is in no way involved here. A. F. L. never had title to, nor is it a party here claiming, the local funds in question. The suit turns solely on the ownership of these funds as between the parties to the suit.

The affirmative charges requested in writing by defendants were due to be given. Their refusal was error. Other questions need not be considered.

Reversed and remanded.

GARDNER, C. J., and FOSTER and LIVINGSTON, JJ., concur.